Defendants. I'm going to take about 10 minutes. Mr. Hamley, who represents Renoir Defendants, will do that, and if there's any time left, I'll use it for a rebuttal. Judge Carroll was correct in finding Twin Books flawed. He was correct in believing that Bissetter should have prevailed. He was correct in believing that these sculptures were in the public domain. Where we believe that Judge Carroll erred was in not distinguishing our case from Twin Books, where he felt constrained to rule in favor of Societe instead of in favor of Bissetter as he wanted to do, which was clear from his order. Counsel, would you please speak up? Oh, sure. Thank you. Okay. Sorry. I'm rarely accused of being soft-spoken. The cases are distinguishable in two main areas. One, the Twin Books case deals with a post-1923 fact pattern. Our case deals with a pre-1923 fact pattern. And the second important area is in Twin Books, the parties availed themselves to this lifeline that the court provided by putting a copyright notice on the work during the pendency of the 1909 Act. In our case, a copyright notice was never put on the works. So the parties never availed themselves to the 1909 Act. For the last 30 years, since 1978, 1923 has become a bright line of demarcation between what is protected by copyright and what is not. And it's basically simple math. Under the 1909 Act, you had a maximum amount of copyright protection for 56 years. The effective date of the 76 Act was January 1st, 1978. With math, 1978 minus 56 is 1922. So 1923 becomes that bright line that we have. So any works created prior to 1923 are in the public domain. Those created after 1923 may or may not be in the public domain. But for 30 years now, we have had a bright, bright line separating the two. Statutorily, there is no basis for finding a pre-1923 work in the public do not in the public domain. There's no case law that says a pre-1923 work is not in the public domain. All the authorities, NIM or PATRI, everybody, the Copyright Office, everybody says pre-1923, public domain, post-1923, there are lots of questions, maybe yes and maybe no. Can you help me? Sure. Because Twin Books itself didn't make this distinction. And I assume that, I mean, you say, well, it didn't have to because it was a post-1923 work. But Twin Books has been criticized, but applied literally here as the district court did. It leads to the result the district court got. In other authorities that have criticized Twin Books, or in scholarly authorities or case law, is there any, are there any that make this distinction that say it should not apply to works pre-1923? The criticism is that it wasn't based on heim, it wasn't based on logic. Right. And there was a fear that if you expand Twin Books, you know, as Nimbus says, works from ancient Greece and all kinds of different things could be protected. So there's this fear of what would happen if Twin Books is allowed to expand at all. And that's why in the second, the second distinction here I think is so critical in this case. In Twin Books, you had a work that was published in 1923 and notice was put on in 1926. Whether we agree with Twin Books or not for this moment is irrelevant because Twin Books clearly is under the 1909 Act. The 1909 Act provides if you put, publish and you have notice, you have protection. In our case, notice was, copyright notice was not put on during the 1909 Act before 1978. And in fact, has never to this very day, no copyright notice has ever been put on these works. So that lifeline, that expansion, that durational expansion that Twin Books provided expired with the end of the 1909 Act. The 1976 Act has a whole different basis for copyright protection. In under 1909, you had federal and you had common law or state. That was all abrogated as of January 1st, 1978. Common law copyright expired. There was no such thing. Copyright protection no longer was based on publication with notice. As of 78, under the 76 Act, copyright protection was derived from the act of creation and fixation in a tangible form. So the whole idea of when you got a copyright, if you had a copyright, after January 1st, 1978 had nothing to do with copyright publication and notice. Therefore, the whole premise under Twin Books of allowing the copyright duration to go beyond was purely a 1909 unique, something unique to the 1909 Act. When that disappeared, what I would call it this Twin Book lifeline also evaporated. Had Societe put on a copyright notice before 1978, then maybe what you're asking, Your Honor, might have applied, you know, to a pre-1923 work. Should we expand Twin Books? Should we not? And the problems that come up with that. But the fact is they never did. They never availed themselves to the Twin Book lifeline. So this case is distinguishable, both on the level of it is not, there's a post. Twin Books is post-1923. We are pre-1923. Twin Books availed themselves of the statutory benefits of the 1909 Act by 1926, putting on the notice. Our, in this case, Societe never did. So these works are clearly different and distinguishable. And, you know, Judge Carroll was so frustrated in not being able to rule the way he wanted to. Unfortunately, he could have if he had, I think, you know, looked at it slightly, slightly differently. But that is. Ginsburg. Let me just ask about Twin Books. Wasn't there a period between 1923 and 1927 when they were neither in the public domain? I mean, they were just sort of in limbo. Is that correct? We called it purgatory, but I think limbo is also, is also. Yeah, that was one of the very bizarre parts of what Twin Books did from a practical application. It wasn't fishing or foul. You know, they said it wasn't under the public, it wasn't protected by state common law, but it wasn't protected by Federal. Normally, you're either or. And here they created this three-year purgatory. I think that the Court, personally, in my analysis, I think the Court was wrong in doing that. As we talk about in our brief, we think they gave extra territoriality effect to half of the 1909 Act by creating that. Don't we have to follow that ruling? Only you can distinguish it. You don't have to file it. Yeah. Thanks. Yeah. You, you only have to file it, follow it, if you don't find it distinguishable, which is what I've been talking about, if it's distinguishable. And also, under the Elrod case by the Supreme Court, the other basis where you don't have to follow it is if there's new superseding higher law. And the Elrod case is a Supreme Court case which came out after Twin Books, which basically dealt with extending the Copyright Act. But in that case, the Supreme Court found that even though the people challenged the Copyright Office's, I mean, the Congress's ability to extend it from life plus 50 to life plus 70, they think that's so long, you shouldn't, you shouldn't extend it that long. Copyright Act is supposed to be finite. Well, the Supreme Court in Elrod basically said, we're not going to second-guess Congress on life plus 50 or life plus 70, because it's still definable. It's still finite. In our case, because of that purgatory which was created, there is no beginning. So therefore, it is any position. I think your next counsel is ready. Thank you. May it please the Court, Michael R. To follow up on what my, by the way, I obviously concur in what my co-counsel just said. Only an en banc panel can throw out Twin Books entirely, as so many copyright commentators would like to have happen, I think. But your honors do have the power to limit Twin Books to fact patterns like what was present in that case, where somebody published overseas without notice and very soon afterwards, they did publish overseas with notice. You can limit it to a fact pattern like that, where notice was placed on it within a few years, or at most, at least while the 1909 Act was in place. If your honors do that, one doesn't get what the Judge Carroll below called an unreasonable result when you have a fact pattern like this one. Now, the ---- But sooner or later, there aren't going to be any more cases presenting a fact pattern like this or like Twin Books. That's right, your honor. Although, if you actually do the analysis, you'd be surprised. It's going to, it still could come up for another, until I think about 2000, sometime in the 2040s, your honor, if you do out the interaction of the 1909 Act and the 1976 Act, this problem could arise. It basically could affect, as the commentators have said, any foreign published works from the first three quarters of the 20th century. Now, how many more of these situations will come up, who knows? There may be a lot. There may be hardly any. I don't know, your honor. But at some point, it will come to an end. But I do think, your honors, definitely can limit it. You have the power to do that. And the Twin Book panel had no occasion to look at limiting it. They didn't have a situation like we do, where this limbo state or purgatory basically went on forever until suddenly in 1978, when the new Act went into effect, these Renoir-Guignol sculptures were resuscitated. They suddenly came out of their suspended animation and suddenly sprung to full about 2047. Also, your honors, I just want to note that while you can limit it to the facts, and that's what we're emphasizing, if you want to see just where Twin Books went wrong, there were two aspects of Twin Books. The first one, nobody fights about, and they relied on the Heim case and Nimeron copyright to hold that a publication, a foreign publication without notice, did not throw those works, the Bambi in that case, into the public domain. We don't quarrel with that. The problem is Twin Books went one step further and said, well, not only did it not get thrown into the public domain, but it didn't trigger the initial 28 period of copyright under American law either. And as had been pointed out, I think in our briefs pretty well, that's contrary to the Heim decision and it's contrary to Nimeron copyright. Mr. David Nimer, who now runs that treatise, you know, he specifically pointed out it was a misread of their treatise. And in the Heim case from the Second Circuit, while Justice Frank, who wrote the majority, didn't have, didn't explicitly say that the first 28 year term would be triggered by publication in Europe without notice, it's very clear that that was the implication of what he was saying. And if you look at Justice Clark's concurrence, his opening line is to the effect, the majority opinion holds that American copyright is secured by publication abroad without the notice of copyright admittedly required for publication here in the United States. So clearly both Heim and Nimeron copyright are contrary to that second holding of Twin Books. But once again, Your Honors, you may limit Twin Books to its fact pattern as you see fit, either where the notice was, there was publication abroad with notice within a few years, or at least while the 1909 Act was in effect. Your Honor, we also have an appeal in this case by society itself on Justice Murguia's October 2007. It's Murguia. Murguia. Excuse me, Your Honor. I wasn't there in the trial. I've only come back to the trial. I came on post-trial. So I apologize to Judge Murguia. Her order from October of 2007, and we believe Your Honor should affirm that in all respects they're being challenged in this appeal. There was sufficient evidence of the elements of a Lanham Act false advertising claim against society. They are not challenging the amount of attorney's fees that were awarded. They say that there should be no attorney's fees awarded at all. We believe that Justice Murguia's order very well puts out the basis for the attorney's fees that basically there were exceptional circumstances twofold. One, their claim under the Lanham Act against us ended up being disposed of by a directed verdict. There was just no evidence at all to support that. That fits within the exceptional circumstances category. As for our own affirmative claim against society for violation of the Lanham Act, that is satisfied under the exceptional circumstances requirement for attorney's fees because of the fact the jury found in a special verdict form that society had willfully engaged in false advertising to try to deceive the public. The last issue in that appeal involves some discovery sanctions against counsel for society. And while they submitted all kinds of authorities from France, Your Honors, about the Hague Convention and the like, the bottom line is Your Honors don't have to decide whether the Hague Convention applied to those depositions that took place over there in France at all. It's all a question of timing, just like Judge Murguia said in her order. It's all a question of timing. They waited until all the counsel and court reporters and videographers had actually arrived in Paris before suddenly bringing up an insistence on the Hague Convention. Last thing I'll note on that is that the French authorities they've given, Your Honors, all came about after this incident. This deposition incident happened before French law was clarified. If Your Honors have any questions, otherwise I'll sit down for now and we can reserve a few minutes. We're okay? Are there any questions? Okay, thank you, Your Honors. May it please the Court, good morning. Richard W. Stevens on behalf of Societe Civil, Succession Richard Guinot, Richard Morris, and the Morris Law Firm. We have a number of issues before the court. I believe we've briefed the Twin Books copyright issue to a great extent in our brief. I believe that the Twin Books court was correct. The simple way to understand why- Does anybody else agree with you? There's no court actually that's held that they're wrong, which is interesting, I think. If there were a parade of horribles involved with Twin Books, I think we'd have seen it in reported cases. We don't. Let me ask you, is there any authority for the limbal state or the purgatory state of copyright? In other words, the time between publication abroad without notice and publication with notice. Is there any authority? Does any other court recognize this? Your Honor, I haven't seen one that has dealt with it in that respect. What we've seen is the Second Circuit time decision. The Second Circuit's Gaste decision, which refers to it in dictum, which we've cited in our brief, and also Twin Books. There isn't any real purgatory. It's a misunderstanding of the situation. It's nice language, but nobody's being punished here. The way the copyright law worked under the 1909 regime and before, unpublished works in the United States remained under common law copyright indefinitely. The concern about a perpetual copyright should have been addressed to the common law, because you had a common law copyright to unpublished works in the United States indefinitely. We've cited Supreme Court cases, etc., to that effect. So a work that was not published in the United States could have been protected until whenever it was published. Overseas, the Heim case pointed out that you could publish a work overseas. For example, in Heim, it was published overseas without US formalities. Well, under US law, it hasn't been published in the United States. So technically, under US law, if someone were to ask, what is the status of the copyright on that work? They would say it's protected by the common law, because it's not yet published with formalities in the United States, and it's not in the public domain. If you read the many authorities, many of them recent, in fact, they point out that it has been a bedrock principle of US law that either a work is protected or it's in the public domain. But there were two forms of protection under the 1909 regime. One was common law until publication, and then upon publication in the United States, either you're protected by the 1909 Act if you do it with formalities, or you go into the public domain, end of game. However, Heim pointed out, no, if it's published overseas, and a couple of the Supreme Court cases before Heim said, if it's published overseas, it does not go into the US public domain. If it doesn't go in the US public domain, the only other place it can be, logically, is US common law. Now, that's rather a theoretical thought, because no one's trying to infringe it in the United States, so there's no litigation about it. But the logic of it is clear, common law until either publication with formalities or public domain. There's no limbo at all, and if you look at Twin Books, Twin Books correctly saw that. The work was published first, Bambi was published first, without formalities, fine, it doesn't fall into the US public domain. Therefore, it is still subject to being copyrighted, either by publication in the US with formalities or by registration with the US Copyright Office. Those are the two ways that they could obtain a US copyright. Before that time, under Heim, it's protected by common law, hypothetically, but you see it's not in the United States, so no one's litigating it here. So that's the logic of it. That's the one route that these sculptures in particular are protected as well. They were not in the US public domain for the entire time. They were not in the United States. They went into registered copyright status when they were registered in 1984. There was correspondence between the Copyright Office and the lawyers for the Société Civil, which is a French trust. They determined that it was copyrightable, and it was copyrighted. So at that point, now the federal regime applies under the 76 Act, and the common law protection would expire. There was no purgatory for this work. And then the statute runs from there. Now we've also argued, and I think accurately, under the section 104A of the Title 17, which is the URAA provisions that harmonize US copyright law with the Berne Convention. Now we have another way that works overseas are protected. And this is an important matter. It's a matter of comedy among the nations. When the US entered into the Berne Convention, the object of the game was for all the nations to have the same regime for copyright. Well, so the US Congress, after President Clinton signed the law, US Congress modified the Copyright Act and now allows for restoration of copyrights. So if my colleagues are correct, that these sculptures went into the public domain for failure to be registered properly, that's one of the provisions under section 104A. If they go into the US public domain for lack of formalities, then they may be restored to copyright status by the section 104A, and it's automatic, doesn't require anything. You do go through a public notice provision, which did actually take place. So the lawyers for the trust took the steps in 1984 to register these copyrights correctly when they finally came to the shores of the United States. And then they also went through the federal register and complied with section 104A. So there has never been a time when these sculptures were not protected by the law. There's no purgatory, no limbo. If it pleases the court, I do need to move to the other issues because there's so many other ones. And I'll be happy to answer questions on the copyright, but I believe it really is pretty straightforward. Twin Books is correct. Under the, I think probably the most difficult part of this case, quite frankly, is what I'm going to explain to you in the next 30 seconds. I want you to imagine, just for purposes of our conversation today, that I own 12 sculptures, personally. I put them on display in a Scottsdale gallery in Arizona. I write the placards that describe these sculptures. I put them for sale with these placards in front of the sculptures. That's what I've done. A dealer in California who deals in art, but not in these sculptures, but deals in art, takes issue with what's on those placards. The California dealer sues, not me, the man who owns the sculptures, not me, the man who's exhibiting them, not me, the man who wrote the placards, and not me, the man who might make some money from selling the sculptures. No, the California dealer sues the French trust that owns the intellectual property in those statutes. And that's what has occurred here, exactly what's occurred here. Mr. Renoir sued Societe Civil for false advertising under the Lanham Act. Well, false advertising first requires that Mr. Renoir prove he has standing to do so. So he needs to prove he's a competitor with the person posting the ad. Societe didn't post any ads, didn't run this exhibition, had nothing to do with it. But he doesn't show competition with Societe. He doesn't show competitive injury. He's not in this business. At trial, he had the opportunity to testify. He never testified, oh, yes, I have many sculptures and I can't sell them anymore, or they've decreased in value, or even that I plan to have any sculptures in the future that I can't sell. So the evidence of his competitive injury is nonexistent. So he doesn't even have standing to bring this action, certainly not against Societe Civil. If he, the second thing is he sued the wrong party. If he were to sue someone, he should sue the person who did the advertising, not the people who didn't do the advertising. And there's, so that is pretty determinative right there, is that he can't even get past those initial hurdles. Of course, there is no interstate commerce involved with this, no interstate advertising, which is another element of the Lanham Act that's required. He also, he needs to prove that there was commercial speech by the defendant. Societe was not involved in any commercial speech. He needed to prove that the false statements, the alleged false statements, caused a diversion of sales or reduced the demand for his products. He didn't have any products. He never testified he had them. He didn't have the usual kinds of evidence having to do with surveys or customer preferences, lost sales, anything of that nature. In fact, even Judge Murgia struck on motion for reconsideration, or undirected verdict, rule 50 motion. She struck $90,000 of the claimed damages. They haven't even appealed that. They know they don't have any damages to prove, and that's again, an element of this case. Damages, they attempt to use the proxy of lost profits. They never proved Societe made any profits on the sale of these because Societe didn't own the sculptures on display. And they didn't own them, and they stood not to make a dime on any sales if any of them were sold. So truly, the Lanham Act, false advertising claim in any of its aspects doesn't survive. The evidence wasn't there. That action was brought in retaliation for the fact that Societe had won on summary judgment and copyright infringement against this very same party, this California dealer. And had won twice, as a matter of fact, had gotten a judgment. What is the essence of the claim of false advertising? I'm in a little trouble here. Sure, well, I'm on the other side of that. But as I understand it, what their complaint is that the placards on these statutes, or these sculptures. These sculptures, he inaccurately described them, in other words. He said he represented them as originals when they worked. That was the testimony of the California dealer, Mr. Renoir, that's correct. Of course, the man who was the son of the actual sculptor, Mr. Gino, refuted that, and he was sitting in the courtroom. So there's a difference of opinion about whether these were, quote, fake or not. It wasn't unsubstantiated. Reproduct, well, it's. Is it, are they reproductions? They're, well, they're, yeah, everything's pretty much a reproduction in some sense. Yes. There, so it was made, it was made. Some of them were made in, at a time before the convent, you know, it's a very complicated case, but back in 1970, 73, some of them were made for an exhibition in France. Of course, that doesn't trigger copyright. But there was an exhibition in France of some of these works, and so there were some made at that time. That was before the 1982 convention then controlled these intellectual property matters more effectively. So there were some in the past that were made, and there was a debate. Well, he says, well, those aren't original, and the guy who did them says they were. I mean, he's the man who owns the, the actual products. I have to go back to your argument that there was insufficient evidence of lost profits. Sure. You didn't argue that before the district court, did you? Yes, we did, Your Honor. We argued it. Before the district court? We did, Your Honor. In fact. You mentioned it in your Rule 50 motion, but I didn't see in the record, you didn't argue that Renoir failed to show evidence of society's profits or unjustified. Well, Your Honor, quite frankly, the way we argued it was there was no proof of damages. The whole notion, in fact, their brief even concedes that there's a, that the term damages can be seen in a number of different ways. They make that point themselves, which I thought was magnanimous of them. The fact of the matter is, the issue was, it's either they can show, either they can show damages to themselves, or as a proxy, the statute and the law allows you to show losses by showing that the other side made money. Okay, so you have either method. They're both a damages measure. It's not something different. It's a damages measure. And the damages, there weren't any damages measured against Societe Civil. We didn't make any money. How could we have had, how could we have had profits of any sort? There weren't any. The person who made any profits, if they were made, were the people who could have sold those sculptures. Those are the owners of them, Mr. Givogue and Mr. Guino as individuals. But it's undisputed, undisputed by both sides that Mr. Givogue, who testified for their side, and Mr. Guino, they were the only owners of these sculptures. Societe stood not to make a penny and never did. So when we argued no damages, we said, yeah, there's no damages, not by any measure, whether it's lost profits or the other side made some money, either way. Did I address your question, Your Honor? Yes, you did. All right. The other Lanham Act part that counsel mentioned briefly, and I do need to touch on it, Societe brought the copyright action. The object of this litigation, this is just a trust, by the way. It's not a large corporation in France. It's a trust that owns intellectual property. The objective of the litigation was to stop the unlawful reproduction of these sculptures, just as had happened already in California once, went through the California case. It was happening now in Arizona. They brought the lawsuit to stop infringement and possibly recover compensatory damages if we could get them. Well, so when you file a lawsuit, you look at the theories that apply to the facts. You had the copyright infringement case, which is pretty clear since we had a registered copyright and the law on our side. The other is the Lanham Act. The Lanham Act would have been able to survive, I'm sorry, it did in fact survive on the same corpus of facts. Which was, these people in Arizona were unlawfully making copies and selling them as Renoir Guino statues, sculptures. Well, that's what unfair competition law is about, is when you use someone else's name with an unauthorized copy and sell it as your own, or sell it as theirs, or use the cachet of the Renoir Guino name to sell a product that isn't authorized. That's a Lanham Act action. So, Societe brought both causes of action, copyright and Lanham Act. They were supported by the exact same facts. It was not a strike suit like theirs against us. This is a different set of sculptures, and it was, so they were on the same set of facts. The copyright cause of action was under constant siege. Constant siege. They brought, we filed a motion for a summary judgment, they fought it, reconsideration. The judge was uncertain that Twin Books was correct. They filed two or three other motions to challenge the decision on copyright. So the copyright cause of action could have disappeared at any time up to and almost the moment of trial. Because of that, it made no sense for Societe to drop the other valid claim, which was the Lanham Act. But Lanham Act is harder to prove. They failed to prove it. They couldn't show lost profits and all the various things, standing and that sort of thing. It's harder to prove Lanham Act, but we could easily now, once we got past the hurdles, show liability, which we obtained by summary judgment, and then all we had to do is prove damages. And we opted for statutory damages. Why? It's the easiest and least expensive to prove. Simplifies the whole trial. So, because the copyright action was always under siege, we had to retain the other cause of action up to the end. Therefore, we were the prevailing party on this case. They shouldn't have been declared a prevailing party on one cause of action that the court decided she didn't see was supported by one part of the case. I'm going to reserve my last few minutes, if I may, in case counsel brings up another issue. First, I want to address Section 104A, the Restoration Act. Counsel just made a statement, and they've been doing this in a brief. They don't understand our claim. We don't claim that they lost their copyright because there was no notice or no renewal or any of the things that are covered by the Restoration Act. We say it's too old. It's that simple. The first work was published in 1913. You had 56 years. The copyright would have ended in 1969. The last one was done in 1917. You had 56 years. It would have ended in 1973. They could have put notices. They could have renewed. They could have manufactured. They could have done everything under the 1909 Act, conformed to every formality, and they were still not going to be subject to protection on January 1, 1978. And that's why it's not covered by 104A, because 104A, on its face, only talks about works that were lost because of a lack of formalities. These weren't. These were lost because they expired. The other point on the Lanham Act is that you may not like what Rintmar put on, but they put on a case. They didn't. They finished their copyright damages case and sat down, and I'm sitting there stunned. I'm going, what happened to the Lanham Act case? We have trial briefs, memos, we prepared our defense on this case. They didn't put on one document, one witness, one scantilla of evidence, and only in their briefs, after it was thrown out and this whole issue came up, all of a sudden, copyright damage evidence is now Lanham Act evidence? Not even close. Different causes of action, different tests, there's nothing overlapping, or there almost is nothing substantively overlapping between copyright damage claim and a Lanham Act claim.  So the court has had a lot of time to look at this case. They had dropped their prior case on conversion, and they should have dropped this case when they realized they didn't have anything there. I want to leave time for that, so if you don't have any questions. Thank you. Roberts. Your Honor, with respect to the cross-appeal, the appeal brought by Societe, in the very front of their excerpts of record that is Societe's is the order by Judge McGuire from October of 07, and rather than get repetitive here, I'll just refer Your Honors to pages 5 through 7 of her order. They set forth the evidence in the record that supports the aspects of the Lanham Act claim by Renoir. Also pages 23 through 25 of our answering brief also deal with this fairly nicely in terms of the aspects. By the way, under French law, after you've made a certain number of reproductions, you can't call them original reproductions anymore. That's one of the issues here. I believe there was also testimony. I could be wrong, but I believe there was testimony. There was some duplicate serial numbering or something on some of the sculptures in terms of, like, what was bogus about the advertising. And then the last point I want to make here is that Section 1117A, which is the one under which you get remedies for violations of the Lanham Act, specifically differentiates three different things you can get as possible remedies. It says defendants' profits, any damages sustained by the plaintiff, and then your costs and attorney's fees and the like. So you see, even in the statute itself, as well as in the case law, cases like Lindy Penn, it's been very much distinguished between actual damages, which would be something like loss to Mr. Renoir, and the fact that that knocked out the actual damages, and we're not appealing, Your Honors, that judgment was made not to appeal that. But lost profits are something else. It's the infringer's profits. It's kind of a misnomer saying lost profits, because it doesn't actually have been something that was taken away from Mr. Renoir. It's basically like an unjust enrichment kind of concept. And there was evidence for that, and our answering brief specifically pointed out that when Judge McGuia, in March of 2007, I guess, yes, March of 2007, when she originally enhanced the lost profits award, she bumped it up from 30,000, which the jury had awarded, to 45,000. In that order back in March, which is in the record, she specifically talked about the revenues that the society folks were receiving for some of these sculptures or sculptures like them, whatever. There is a basis for a lost profits award, and there's certainly a basis for an injunctive relief.  One last point, simply, we believe, Your Honors, can limit twin books under one of three grounds. Where there was publication with notice a few years after, or where there was publication with notice while the 1909 Act was in place. Or, as Mr. Kaufman was saying, where you're dealing with a post-1923 situation. Last point is simply that if Your Honors, for some reason, feel that you cannot limit twin books, but you do have doubts about twin books, don't like twin books for whatever reason. I would ask that you put that in your opinions, because it might help us if we have to try to go en banc. Thank you very much, Your Honors. May it please the court. Thank you very much. Begging your court's pardon. There was one other issue I do want to briefly touch on, I need to touch on as part of our appeal, and that is the Paris deposition debacle. I'll respond to some of their other points in just a moment. But in the Paris deposition situation, the rule that the defendants would like to have this court, I guess, announce is that it is now the duty of the responding party to research the law to make sure the propounding party does things right. In my first year of practice in LA as a young associate, we learned when we were propounding party of depositions or written discovery, it's our job to look up the rules. We go to the rudder group books, we go and research this. In fact, one of my assignments as a first year lawyer was to find out how you take a deposition in, I think it was in the UK at that time. It's the job of the propounding party to find this out. The other side, it's an amazing situation. They apparently, with all the lawyers, three law firms being paid all these hundreds of dollars an hour, nobody looked up the law of how to take a deposition in Paris. So they didn't do what they were supposed to do. It wasn't a matter of a surprise objection, it was a matter of them failing to do what they had to do. Be the same as if they didn't have a court reporter that was certified or if someone wasn't admitted to the jurisdiction to practice. That wouldn't be something that the responding party has to reply to. And it would be, I think, a devastating ruling if this court were to rule that it is now the duty of the responding party and discovery to find out the law for the propounding party. The judge to whom this issue was initially presented, Judge Carroll, decided not to decide who was right on the cross motions for sanctions in the Paris deposition case. Then Judge Carroll recused himself from the case some months later. Judge Murgia, over a year and a half later, decided that she would impose these sanctions. But she wasn't even the judge before whom the issue was initially brought. So there's quite some delay between the time the Paris deposition problem took place and a different judge entirely made the ruling to impose sanctions on the lawyers who weren't there and weren't responsible for researching this issue. And just briefly on the Lanham Act notion, the cross complainants, counter complainants have cited Lindy Penn, the case of Lindy Penn. Lindy Penn is a trademark action, not a false advertising case, and the distinction is tremendous. The way you look at analyzing damages in a false advertising case has to do with what damage is done to competition. In the case of trademark, there's much more of a proprietary interest. So you may look at other kinds of measures. But Lindy Penn doesn't apply to false advertising. They didn't prove that Societe falsely advertised or stood to make a cent or ever made a cent on any of these transactions. Thank you so much, Your Honors, if you have no further questions. Thank you. Thank you. The case just argued is submitted for decision, and that concludes the court's calendar for this morning. The court stands adjourned.
judges: Schroeder, Nelson, Reinhardt